**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Wanda M. Moran, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | Case No. 4:07-cv-073 |
| | ) | |
| Defendant. | ) | |

Plaintiff Wanda M. Moran seeks judicial review of the Social Security Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"). Chief Judge Hovland has referred this matter to the undersigned for preliminary consideration.

I.    BACKGROUND

A.    Procedural history

Moran protectively filed applications for DIB and SSI on August 5, 2004, alleging a disability onset date of March 25, 2004. (Tr. 90-95, 256-60, 282). Her applications were denied initially on January 27, 2005, and upon reconsideration on June 20, 2005, prompting her to request a hearing before an administrative law judge ("ALJ"), which was held on November 14, 2006. (Tr. 36-51, 261-265, 279-303). In the meantime, she amended her onset date to July 18, 2005. (Tr. 282).

The ALJ issued his written opinion on February 14, 2007, opining that Moran was not disabled within the meaning of the applicable regulations and therefore entitled to neither disability insurance benefits nor supplemental security income. (Tr. 25-34). Moran requested that the Appeals

1

Council review the ALJ's decision.  (Tr. 19-21).  She later learned by letter dated September 18, 2007, that the Appeals Council had denied her request for review and adopted the ALJ's decision as the Commissioner's final decision.  (Tr. 7-10).

Moran initiated the above-captioned action on October 22, 2007, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  See Docket No. 1.  The parties filed their respective Motions for Summary Judgement on February 14, 2008.  See Docket Nos. 8 and 12. Shortly thereafter Moran filed a response in opposition to the Commissioner's motion.  See Docket No. 14. Thus, this matter is ripe for the court's consideration.

**B.     General Background**

Moran was born on October 31, 1962.  (Tr. 296).  She graduated from high school and, upon completion of a nine-month course at IBC, received a receptionist certificate.  (Tr. 295-96).  She has worked at various times as a bank teller, teacher's aide, nursing home assistant, restaurant hostess, day care provider, and most recently as a clothes presser for a dry cleaner.  (Tr. 113, 122-24, 285-86).  She has not engaged in any substantial gainful activity since July 2005.  (Tr. 286-87).  She has acquired sufficient quarters of coverage to remain insured under the terms of the Social Security Act through June 30, 2010.  (Tr. 25, 27).

Moran has a history of migraine headaches, suffers from a sleep disorder, complains of chronic fatigue, and is being treated for depression.    (Tr. 131, 197-98).  She has also sought treatment for musculoskeletal soft tissue pain (also referred to as a musculotendinous pain disorder). (Tr. 180, see generally Tr. 182-203). She has displayed hypersensitivity, pronounced pain reactions, and "amplified soft tissue reactions and perceptions." (Tr. 183-84).

2

Moran has been prescribed Inderal for her migraine headaches, Amitriptyline and Fluoxetine for depression, Zelnorm for her stomach, and Triamterene/Hetz for her blood pressure. (Tr. 136, 141, 172). For general pain relief she has taken Lyrica, acetaminophen with codeine, and cyclobenzaprine. (Tr. 136, 141, 172). She has also utilized with some success a regimen of hot baths and heating pads. (Tr. 136, 287, 289). Aside from drowsiness and sensitivity to sunlight, she has reportedly suffered minimal side effects when taking her various medications. (Tr. 136, 292).

### C.   Medical History

Moran presented to Dr. A. Marc Nielsen on November 5, 2003, for her annual exam. (Tr. 201). Her chief complaint was that she was suffering from frequent migraine headaches, for which she was given a prescription for Inderal. (Tr. 201-202).

Moran returned to Dr. Nielsen on February 25, 2004, for an emergency room followup (she had apparently reported to the emergency room five days prior with a nosebleed and high blood pressure). (Tr. 199). According to Dr. Nielsen's treatment notes, Moran was not in distress and, upon completion of her examination, was sent on her way with instructions to keep a blood pressure log. (Tr. 199).

Moran sought treatment on July 21, 2004, for a left foot injury. (Tr. 198). X-rays of her foot were negative. (Tr. 198). She was instructed to treat her abrasions with an antibiotic ointment, ice and elevate her foot, and take ibuprofen for the pain as necessary. (Tr. 198).

Moran reported to Dr. Robert Kemp on August 2, 2004, with complaints of muscle aches and pains in her neck, shoulders, back, and legs. (Tr. 197). She also reported that she was having trouble sleeping and had been taking Tylenol PM. (Tr. 197). Dr. Kemp recommended that she undergo some simple laboratory screening tests, which she initially resisted because she lacked

insurance. (Tr. 197). Dr. Kemp started her on Fluoxetine and "wrote her [a prescription] for work to not be lifting consistently greater than 5 pounds due to presumptive fibromyalgia." (Tr. 197).

Moran returned to Dr. Kemp on September 7, 2004, for a followup examination. (Tr. 196). She complained of continued pain in her left shoulder and arm as well as her knees, adding that she had recently discovered there was history of musculotendinous orders in her family. (Tr. 196). She also reported to having cut back to four hours of work per day. (Tr. 196). Noting that she was in no acute distress, Dr. Kemp continued her on Fluoxetine. (Tr. 196).

Moran next visited Dr. Kemp on October 12, 2004. (Tr. 195). According to Dr. Kemp's treatment notes, she was feeling slightly better since taking antidepressants but was continuing to experience nightly aching in her legs and a lot of pain after working. (Tr. 195). Finding her pain disorder suggestive of fibromyalgia, Dr. Kemp signed a prescription note stating that she should work no more than four hours per shift. (Tr. 195, 255). He further recommended that she stay on her current medications. (Tr. 195).

Moran returned to Dr. Kemp on November 17, 2004, reporting that her symptoms had not shown any improvement, that her musculotendious pain was progressing, and that rest and heat were her only sources of relief. (Tr. 193). Dr. Kemp referred her to physical therapy for heat and light massage. (Tr. 193). He also referred her top a rheumatologist, Dr. James Lampman. (Tr. 193).

Moran presented to Dr. Nielsen for an examination on December 21, 2004, at the request of Social Security Disability Determination Services. (Tr. 143, 191). Dr. Nielsen stated the following in his examination notes: Moran suffered diffuse pain that she rated as a five-to-six on a scale of one-to-ten. (Tr. 191). Her pain increased to nine following physical activity. (Tr. 191). Her symptoms had shown improvement after she had cut back to part-time work. (Tr. 191). However,

upon her return to full time-work, she was unable to function secondary to excessive pain. (Tr. 191). She could ambulate without difficulty. (Tr. 191). She could also get into a squatting position but needed help to stand up. (Tr. 191). She was otherwise in no distress, exhibited coordination within normal limits, and was able to grasp simple objects. (Tr. 192). Dr. Nielsen closed by listing as his assessment that she was suffering from fibromyalgia and stating that a "[r]ecommendation for disability will be made by Social Security Disability Determination Services." (Tr. 192). He also issued a prescription to Moran on December 22, 2004, which stated that she should work no more than two days per week. (Tr. 190).

Moran returned to Dr. Kemp on January 10, 2005, reporting that she had cut back to working two four-hour shifts per week, that her pain was becoming more diffuse and moving into her hips, and was having trouble sleeping at night. (Tr. 189). She added that she had tried to take walks and that she was continuing to take hot baths (which seemed to provide a modicum of relief) but was most comfortable when lying down with her feet elevated. (Tr. 189). Dr. Kemp observed that Moran was in no acute distress and that her lab work had come back negative. (Tr. 189). He nevertheless started her on Flexeril and neurontin. (Tr. 189).

On January 27, 2005, a state agency physician reviewed Moran's records in connection with her application for disability benefits. (Tr. 205-211). In the agency physician's opinion Moran could lift 20 pounds occasionally and 10 pounds frequently; stand/walk or sit for six hours each in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 205-206). Moran's application for benefits was denied the same day. (Tr. 42).

Dr. James Lampman conducted his examination in early February 2005 based on the referral that was made prior to SSA denying Moran benefits and communicated the results of his evaluation

in a letter dated February 4, 2005, to Dr. Kemp at the Craven-Hagan Clinic, where both Drs. Kemp and Nielsen practiced. (Tr. 182).  In Dr. Lampman's opinion there was: (1) a pattern of multifocal musculotendinous pain with some recognizable features; (2) an indication of central processing disturbance; and (3) an occurrence of employment dysfunction attributable in part to past injuries. (Tr.184).  He recommended a course of very conservative treatment while offering Moran his assurance that no threatening or organ-damaging ailment was present.  (Tr. 184).

Moran presented to Dr. Lampman on April 11, 2005, with complaints of intense pain upon engagement in physical activity.  (Tr. 180).  Dr. Lampman observed no visible swelling or loss of range, adding that Moran's laboratory results were negative, that she could stand and walk easily, and that her long-term outlook was positive.  (Tr. 180).

On April 27, 2005, Dr. Nielsen wrote a letter on Moran's behalf stating that she suffered from chronic pain related to fibromyalgia and was restricted indefinitely from working more than two days per week, four hours per day, due to unsatisfactory pain control with a greater amount of exertion.  (Tr. 187).

A second state agency physician affirmed the earlier state agency physician's assessment by a one sentence statement on June 14, 2005 .  (Tr. 211).  It is impossible to tell from the court's record what medical records he actually reviewed.  On June 20, 2005, the SSA denied Moran's request for reconsideration of its earlier denial of benefits.  (Tr. 37).

On July 18, 2005, Moran presented to Dr. James Kennedy, who noted that he had seen Moran previously on two occasions about her chronic pain difficulties. (Tr. 218).  Dr. Kennedy also mentioned that Moran's applications for Social Security benefits had been denied and that the current visit was "primarily for the purpose of completing documentation."  (Tr. 218).  He went on to note that Moran had been working four hours each morning at a local dry cleaner; had problems

6

"for at least 2-3 years with pain;" was complaining of migraine headaches, morning stiffness, pain in her neck, shoulders, elbows, and low back; and was unable to stand in any one position for very long. (Tr. 218). On examination, Moran "[had] difficulty getting from sitting to standing and when asked to squat had to reach out to help pull herself up with the aid of nearby furniture." (Tr. 219). She could walk on her toes, had difficulty walking on her heels and could only flex forward until her fingertips were at knee-level. (Tr. 219). She also had diminished range of motion in her neck and left shoulder as well as multiple trigger points. (Tr. 219). Dr. Kennedy concluded that she was suffering from a chronic pain disorder that might be related to a fibromyalgia syndrome. (Tr. 219).

Moran followed up with Dr. Kennedy on October 13, 2005. (Tr. 217). She reported that she was sleeping poorly but was "feeling significantly better since she ceased work," had "negligible pain for the most part," was "controlling her pain by limiting her activities," and was "walking at least 20 minutes daily." (Tr. 217). She added that she kept herself busy with activities around the house and remained capable of doing most of her housework, albeit one room at a time. (Tr. 217). According to Dr. Kennedy, she "appear[ed] well until she move[d]," that she moved very hesitantly, that she maintained a slightly flexed posture at the hip and knees, and that she had diminished range of motion of her lumbar spine. (Tr. 217). She also exhibited exquisite tenderness to palpation of the calves and knees and her responses appeared to be "amplified" (Tr. 217). Dr. Kennedy advised her that she might benefit from steroid injections as they might help reduce any inflammation. (Tr. 217). There is nothing in her records to suggest that she received any such injections, however. (Tr. 217).

On November 10, 2005, Dr. Kennedy noted that Moran had a "rather peculiar chronic pain syndrome" that he was somewhat hesitant to call fibromyalgia. (Tr. 216). Moran reported increased pain with any physical activity. (Tr. 216). She also reported that she could do some housework as

well as some stretching once a day, but otherwise was unable to do much else. (Tr. 216). On examination, she was not acutely distressed and walked without obvious difficulty. (Tr. 216).

On December 12, 2005, Moran presented to Dr. James Lampman for a follow-up review of her muscoskeletal problems. (Tr. 233). According to Dr. Lampman's notes, Moran had been able to drastically diminish her pain by taking a "leave of absence" from work. (Tr. 233). She was able to perform simple home tasks and engage in light exercise. (Tr. 233). She avoided crouching, stair-climbing, lifting objects, and going on long car rides. (Tr. 233). Upper extremity pain inhibited her ability to type. (Tr. 233). Dr. Lampman was unable to perform a "good hands-on exam" of Moran because of the intensity of her pain. (Tr. 233). He nevertheless observed that she was able to stand and walk adequately, that her overall appearance, gait, and mood had improved, that all of her limbs moved readily, and that she did not exhibit any tremor, ataxia, spasticity, or Parkinsonism. (Tr. 233). His diagnosis was a "comprehensive pain sensitization disorder with certain features resembling a resiliency problem at the iliac crest regions, elbow epicondyles, and patellofemoral structures without a recognized overt degenerative or inflammatory disease process." (Tr. 234). He noted that her condition had "resulted in drastic employment restriction." (Tr. 234).

Moran returned to Dr. Kennedy on January 6, 2006, reporting that she had been suffering from migraine headaches (which she attributed to stress) as well as severe pain in her left gluteal region. (Tr. 214). However, she also reported she was "doing well" with respect to her chronic pain situation. (Tr. 214).

Dr. Kennedy wrote to Moran's attorney on January 18, 2006, to confirm that Moran had been unable to work since July 2005 and would most likely be unable to work into the foreseeable future.

(Tr. 223).  In a second letter dated March 29, 2006, he again noted that Moran had ceased working and deferred to Dr. Lampman's assessment of Moran's circumstances.  (Tr. 221-222).

On June 13, 2006, Dr. Lampman completed a "Fibromyalgia Impairment Questionnaire" at the request of Moran's attorney.  (Tr. 236-241). In his estimation, Moran could sit for three hours and stand/walk for three hours total in an eight-hour day, could not sit continuously in a work setting, and needed to move around every thirty minutes for five minutes.  (Tr. 239).  She could occasionally lift up to 20 pounds and occasionally carry up to 10 pounds but could never lift more than 20 pounds or carry more than 10 pounds, with no opinion expressed as to what weights she could tolerate frequently.  (Tr. 239-241).  She also needed to avoid wetness, temperature extremes, pushing, pulling, noise, fumes, gas, heights, kneeling, bending, and stooping.  (Tr. 239-241).  Dr. Lampman believed she was incapable of tolerating even "low stress" jobs, would likely need to take frequent, unscheduled 20-minute breaks, and could be expected to miss work more than three times per month.  (Tr. 240).  He concluded by stating that a functional capacity evaluation "could help quantify [Moran's] endurance [and] work possibilities."  (Tr. 241).

On June 28, 2006, Moran underwent a functional capacity evaluation with physical therapist Marty Haug, ATC, DPT at the Mercy Wellness Center.  (Tr. 242-251).  During testing, Moran presented an "abnormal" score on the McGill Pain Questionnaire.  (Tr. 243)  She was unable to complete a repetitive activities test.  (Tr. 245).  Her flexibility in her hips was assessed as severe.  (Tr. 245).  She nevertheless performed well on a vertical ladder climb, which indicated she could take continuous steps, and had good muscle output in all extremities.  (Tr. 245).  Therapist Haug questioned the reliability of specific strength tests on account of Moran's perceived pain, noting that Moran could not perform spring or palpitation tests due to skin hypersensitivity and that she

9

exhibited an "[e]xaggerated withdrawal reaction to slight pressure/touch to the back and calf areas."

(Tr. 246).  He found it difficult to measure her joint motions due to "perceived pain and shakes," but

noted that her elbow and knee range of motion appeared normal.  (Tr. 247).  On static lifting tests,

she  was "repeatedly instructed to give maximum effort."  (Tr. 247-248).  She showed outward signs

of difficulty with all dynamic lifting tasks.  (Tr. 248).

As to endurance, Haug found that she could lift, carry, push, and pull between six and

thirteen pounds frequently, and between twelve and twenty-five pounds occasionally.  (Tr. 248,

249).  However, he added that, because of her pain complaints, she would be unable to perform at

those levels over an extended period of time (Tr. 248, 249).  Haug went on to note that test scores

on the inappropriate illness behavior profile were positive in three of four categories tested and, that

on a validity profile, her scores were invalid on four of four categories tested.  (Tr. 249, 250).  Haug

concluded that her major limiting factors included poor effort and perception of pain and that she

could not tolerate prolonged standing or sitting, static reaching, or crawling (Tr. 250). He believed

that she "could push herself into a higher level of mobility if she wanted," and noted that during

dynamic activities she appeared to be able to flex her knees more than she had during the initial

attempt to measure flexion.  (Tr. 250).

In a concluding section to the Mercy Wellness Center's report entitled "Evaluator's

Comments,"  Haug stated the following:

> Patient struggled with pain levels and performance in almost all aspects of the FCE.
> Due to the consistently high levels of reported pain, I do not anticipate the patient
> returning to her previous occupation.  *Limitations seen during the FCE would
> suggest difficulty at any occupational level*.

(Tr. 251) (emphasis added).  Then, in the final section entitled "Physical Demand Classification, the

report indicates that Moran's performance nominally placed her within the "Light PDC" level of the

10

U.S. Department of Labor's standard for Physical Demand Classification, which allows for the lifting of 15 pounds occasionally, eight pounds frequently, and three pounds constantly, but the report qualified this by stating that lifts at this level more than five times per day would put Moran at "significant medical risk." Consequently, the report states that the recommended safe levels were lifting 12 pounds occasionally, six pounds frequently, and two pounds constantly. (Tr. 251).

  **D.**   **Other Evidence**

  In questionnaires submitted in connection with her applications for benefits prior to her ceasing even part-time work, Moran reported that she is plagued by fatigue, does not drive long distances, cannot watch her grandchildren, and neither vacuums nor scrubs. (Tr. 131-132). She also reportedly has difficulty standing for prolonged periods, can only sit for fifteen to twenty minutes before having to move around, gets help drawing her bath, can lift a maximum of two pounds on her good days, and walks ten to fifteen minutes for exercise. (Tr. 146-147). She also looks to her daughter for assistance when shopping and when it comes time to manage her finances. (Tr. 148). When asked to describe her typical day, she stated that she awakes at 5:00 a.m., works until 10:00 a.m., goes home and naps until 2:00 p.m., does a load of laundry, dusts, waters plants, sits on a heating pad for about an hour, sometimes prepares dinner (with the help of family members and/or friends), and then rests for the remainder of the evening. (Tr. 132-133, 137).

  Moran's daughter reported by letter that she helps draw Moran's bath after work, helps prepare meals, helps clean Moran's house, and often runs errands for Moran. (Tr. 152). Another of Moran's acquaintances, Kermit Lee, reported in a letter dated February 28, 2005, that he had observed Moran steadily "go down hill," adding that he too on occasion draws Moran's baths and helps clean Moran's house. (Tr. 153).

11

The SSA also received an undated, anonymous letter purportedly written "on behalf of a number of family members who [were] having doubts about [Moran's] need for disability payments." (Tr. 174). The letter states in part:

> Moran can sit in a boat fishing from sun-up to sundown, sometimes 2 or 3 days in a row, or sit at home knitting for hours on end; has her grandchildren at her house from infants to 4 & 5 years old, without their parents, day after day, many times overnight; she mows the lawn; moves her furniture around 2 or 3 times a month, vacuums daily, scrubs floors on hands & knees at least one a week; dances up a storm when she goes to the bar; helped her boyfriend remove and replace the dryer, install an air conditioner, put siding & tin roof on a garage, and paint.

(Tr. 174). The letter attributes to Moran comments to the effect that "she doesn't dare mow the lawn anymore because she's afraid someone from Social Security will see her and she'll blow her chance at a disability." (Tr. 174). Finally, the letter accuses Moran of conniving her doctors into rewording her reports to "improve" herself in the eyes of the Social Security Administration and of discontinuing her medications prior to submitting to an evaluation to ensure that she did not perform well. (Tr. 174).

### E.    Administrative Hearing

At the beginning of the hearing, there was an exchange between the ALJ and Moran's attorney about the admissibility of the anonymous letter. The ALJ asked whether there were any objections to the proposed exhibits, which included the letter, and the attorney responded by noting the letter. Thereafter, the exchange is muddled and at one key point the transcript fails to reflect the response of Moran's attorney, reporting "no audible response." The uncertainty revolves around whether Moran's attorney was merely objecting to the weight to be given to the letter or whether there was an actual objection to its admissibility. (Tr. 281-282).

12

During the hearing, Moran was called to testify by her attorney.  Moran first addressed the anonymous letter.  She testified that she believed the letter probably came  from her ex-husband, who she continues to have disputes with over child support and who she described as being very vindictive as a result of what she characterized was a bitter divorce.  She testified that, contrary to what was stated in the letter, her daughters are fully supportive of her and her claim for disability. (Tr. 283-284).

Moran testified that she stopped working because she "just couldn't take the pain anymore." (Tr. 286).  When asked to elaborate, she testified to having pain in her legs, arms, back, and neck, numbness in her arms, and muscle spasms in her legs.  (Tr. 286).  She added that her last job had involved a lot of lifting, pulling, standing, and repetitive movements which tended to aggravate her symptoms.  (Tr. 287).  As for her emotional state, she noted her depression for which she had taken antidepressant medication and had sought out counseling.  (Tr. 287, 294).  She stated the medication had proven helpful as had her counseling sessions.  (Tr. 297, 294).

When queried about her general physical condition, Moran testified that she has balance issues and walks with a cane on Dr. Kennedy's recommendation, is capable of standing for only five to six minutes at a time, can sit up to fifteen minutes at a time, can only lift about two pounds without difficulty, and has trouble sleeping on account of her pain.  (Tr. 289-90, 292-293).  She also testified that she spends three to four hours out of an eight-hour day lying down and elevating her legs in an effort to alleviate her discomfort.  (Tr. 291).

Moran went on to testify that she had curtailed some of her activities on account of her condition.  (Tr. 287).  Specifically, she testified that she is dependent on her daughter to do all of the housework and help with grocery shopping, that she no longer goes out socializing, and no

longer knits, gardens, rides horse, or types.  (Tr. 287-88, 293).  She also reported that she has difficulty getting dressed on particularly bad days.  (Tr. 288).  She later stated that, while she can button buttons "pretty good," she is not always able to maintain her grasp on objects and can no longer tie her shoelaces on account of the stiffness in her hands and fingers.  (Tr. 290-91).

At the close of Moran's testimony, the ALJ posed a series of hypotheticals to the vocational expert.  (Tr. 283). The ALJ initially inquired whether a hypothetical woman between the ages of 42 and 44 with Moran's education and experience could return to her past relevant work if saddled with the following limitations: the ability to lift twenty pounds occasionally and ten pounds frequently as well as the occasional ability to climb, stoop, kneel, crawl, or crouch.  (Tr. 297).  The vocational expert responded that, while some of the past work would be too physically demanding, such a person would likely be capable of returning to her position as a bank teller or hostess.  (Tr. 297). When asked by the ALJ what impact, if any, would be wrought by the additional requirement that this hypothetical woman be free to alternately sit or stand, the vocational expert ruled out a return to any past work.  (Tr. 298).

The ALJ next inquired whether there were any jobs to which the hypothetical woman's skills would transfer, to which the vocational expert responded that such a person would likely be able to perform some sedentary jobs–food and beverage order clerks, charge account clerks, and information clerks being examples–so long as she could alternately sit and stand.  (Tr. 298).  The ALJ then asked whether the hypothetical woman would be able to hold such jobs if she could not keep a schedule set by others and would have to take unscheduled breaks throughout the workday. (Tr. 299).  The vocational expert responded that an inability to adhere to another's schedule was prohibitive.  (Tr. 299).

Picking up where the ALJ had left off, Moran's counsel asked the vocational expert whether the hypothetical woman's employability would be adversely impacted if she were absent more than three times per month.  (Tr.  300).  The vocation expert responded that such absenteeism on a consistent basis would rule out competitive employment.  (Tr. 300).

**F.     ALJ's Decision**

The ALJ issued his written opinion denying Moran's application for disability insurance benefits and supplemental security income on February 14, 2007. (Tr. 25-34).  When reviewing the applications, he employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520. (Tr. 26-27).  He quickly dispensed with the first step, acknowledging that Moran had not engaged in substantial gainful activity since July 18, 2005. (Tr. 27-28).

Moving on to the second and third steps, the ALJ concluded that Moran suffered from severe impairments–migraine headaches and a disorder of the muscle, ligament, and fascia–that nevertheless did not meet or equal the severity of a presumptively disabling impairment listed in the Commissioner's regulations.  (Tr. 27-28).

At the fourth step of his analysis, the ALJ assessed Moran's residual functional capacity, that is, her ability to do sustained work-related physical and mental activities in a work setting on a regular basis. He conceded that Moran's medically determinable impairments could reasonably be expected to produce the alleged symptoms.  (Tr. 30).  However, he questioned whether Moran's statements regarding the intensity, persistence, and limiting effects of her symptoms were entirely credible without providing much of an explanation.  (Tr. 30).  In terms of the anonymous letter, the ALJ stated that he gave it "little weight" because of the potential for bias.  But, as discussed in more

detail below, he allowed it to remain in the record, did not say he was according it no weight, and the Commissioner in his brief to this court relies upon it.

The ALJ also discounted, in part, the conclusions reached by two of Moran's treating physicians in terms of the impacts of her pain and her impairments based upon inconsistencies between their objective findings and subjective conclusions and based upon the results of a residual functional capacity assessment. (Tr. 30-32). As discussed later herein, the ALJ did not discuss the findings or conclusions of two physicians who provided treatment to Moran that were arguably contrary to the ALJ's findings and conclusions. And, as noted earlier, Moran was actually referred to one of these physicians by the SSA for an examination.

Based upon his review of the evidence, the ALJ determined that Moran's residual functional capacity was as follows:

> [She] has the residual functional capacity to occasionally lift or carry ten pounds frequently and lift or carry less than ten pounds; to stand or walk in thirty minute increments and with normal breaks, for about two hours in an eight-hour workday; to sit in thirty minute increments, and with normal breaks, for six hours in an eight-hour workday, with the freedom to sit or stand at will; to push and pull, including the operation of hand and foot controls without limitations. The claimant can frequently climb stairs and ramps, but never ropes, scaffolds, or ladders. She can frequently balance, stoop, crouch, squat, kneel and crawl. She can reach in all directions, including overhead, perform fine and gross motor manipulations and exercise the sense of touch without limitation. She has no communicative, environmental exposure or psychological limitations.

(Tr. 28-29). He further determined that, given this residual functional capacity, Moran was incapable of performing her past relevant work. (Tr. 32).

At the fifth step, the ALJ determined that Moran was capable of making a successful adjustment to two sedentary jobs in significant numbers in the national economy given her age,

education, work experience, and residual functional capacity.[1]   (Tr. 33).   Consequently, he

concluded that Moran was not disabled as defined in the Social Security Act from July 18, 2005,

through the date of his decision.  (Tr. 33).

## II.   LEGAL DISCUSSION

### A.   Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo*

review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's

decision is supported by substantial evidence.  Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence.

Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838

(8th Cir. 1992).  It is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402

U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach

contrary, inconsistent results.  Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  Thus, the

standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny

benefits without being subject to reversal on appeal."  Id.   Consequently, the court is required to

affirm a Commissioner's decision that is supported by substantial evidence - even when the court

would weigh the evidence differently and reach an opposite conclusion.  Id.

---

[1]  It appears this conclusion was reached based upon the Department of Labor's Dictionary of Occupational Titles's criteria for physical exertion limits for the two sedentary jobs that the vocational expert testified existed in significant numbers in the national economy.  This is because the hypothetical posed by the ALJ to the vocational expert inexplicably used the limitations on functional capacity opined by the state DDS physicians, which the ALJ's opinion does not appear to have relied upon because they are  not mentioned and which  allow for greater exertion levels than found by the Mercy Wellness Center's RFA.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole.  See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993).  The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide."  Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner.  The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner.  Ellis v. Barnhart, 392 F.3d at 993.

**B.      Law governing eligibility for adult benefits**

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act").  42 U.S.C. § 423(a)(1)(D).  To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment.  42 U.S.C. § 423(d)(1)(A)."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the

claimant would be hired if he or she applied for work.  42 U.S.C. § 423(d)(2)(A).  Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.

In deciding whether a claimant is disabled within the meaning of the Act,  the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)      whether the claimant is presently engaged in a substantial gainful activity,

(2)      whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)      whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)      whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)      if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations.  20 C.F.R. § 404.1545.  The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations.  Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions."  Id.  In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d

1320 (8th Cir. 1984).[2]  E.g., Ellis v. Barnhart, 392 F.3d at 993-996.  Claimant's subjective

complaints may be discounted only if found to be inconsistent with the record taken as a whole.

Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that

are supported by accepted diagnostic techniques and that are not inconsistent with other substantial

evidence.  This rule does not apply, however, to opinions regarding disability or inability to work

because these determinations are within the exclusive province of the Commissioner.  The Eighth

Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating
> physician's medical opinions that are supported by the record. See Randolph v.
> Barnhart, 386 F.3d 835, 839 (8th Cir.2004); 20 C.F.R. § 404.1527(d)(2). A medical
> source opinion that an applicant is "disabled" or "unable to work," however, involves
> an issue reserved for the Commissioner and therefore is not the type of "medical
> opinion" to which the Commissioner gives controlling weight. See Stormo [v.
> Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are
> not medical opinions that should be credited when they simply state that a claimant

---

[2]  In Polaski, the Eighth Circuit approved a settlement agreement with the Secretary of HHS that contained, in part, the following language, which the court stated was a correct statement of the law with respect to the manner in which subjective pain complaints are to be analyzed:

> While the claimant has the burden of proving that the disability results from a medically
> determinable physical or mental impairment, direct medical evidence of the cause and effect
> relationship between the impairment and the degree of claimant's subjective complaints need not be
> produced. The adjudicator may not disregard a claimant's subjective complaints solely because the
> objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree of severity of subjective
> complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and
> complaints. The adjudicator must give full consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work record, and observations by third parties
> and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication; and
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis
> of personal observations. Subjective complaints may be discounted if there are inconsistencies in the
> evidence as a whole. [Emphasis in original.].

739 F.2d at 1322.  The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

> can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
>
>  . . . .
>
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner.  The Commissioner is charged with making his own disability determination based upon the criteria set forth in the Social Security law.  20 C.F.R. § 404.1504. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996).  And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Pearsall v. Massanari, 274 F.3d at 1217.

## III.    Analysis and Discussion

### A.    Introduction

Moran argues that the ALJ's decision is deficient in a number of respects.  After careful review, the undersigned agrees in part and reluctantly concludes this matter should be remanded to the agency for further consideration, particularly given the totality of the deficiencies.

**B.    The failure to discuss treating-source opinions**

**1.    SSA's regulations require that the ALJ "always" discuss the weight given to treating-source opinions**

The treatment of opinion evidence in disability cases is governed by 20 C.F.R. § 404.1527,[3] which provides for two tiers of medical evidence.  The first tier consists of opinions from treating sources, which, under subsection (d), are granted controlling weight provided that they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence.  See also Hamilton v. Astrue, 518 F.3d 607, 610 (8th  Cir. 2008).  Examples of when a treating-source opinion may be discounted or disregarded include when it consists only of conclusory statements, when there are other medical assessments that are supported by superior medical evidence, or when the treating source has offered inconsistent opinions.  See  Hamilton v. Astrue, 518 F.3d at 610 (citing Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir.2001)).

The second tier of medical opinions consists of opinions from other physicians, psychologists, and medically accepted sources, including state agency consultants and treating sources that are not accorded controlling weight.  Section 404.1527 requires that these opinions be evaluated according to the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is of a specialist; and, (6) any other factors which tend to support or contradict the opinion. See 20 C.F.R. §§ 404.1527(b)-(f).

---

[3]   20 C.F.R. § 416.927 is virtually an identical regulation and applies in SSI cases.  For purposes of convenience, the court will restrict its discussion to the disability regulation.

In addition to mandating how treating and non-treating opinion evidence is to be evaluated, § 404.1527 also requires that the ALJ explain the weight given to the opinions from acceptable medical sources.  With respect to opinions by "treating sources," subsection (d)(2) provides:

> We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

And, for opinions from other medical sources, subsection (f)(2)(ii) states:

> Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions from State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

### 2.      Drs. Kemp and Nielsen were treating sources

Moran argues that the ALJ erred when he failed to discuss the medical findings and conclusions of Drs. Kemp and Nielsen.  As noted in the medical summary, Drs. Kemp and Nielsen are from the same clinic and each provided treatment to Moran multiple times and together over an extended period.  Further, as discussed in more detail below, the ALJ referred to certain findings from one of Dr. Nielsen's reports, without referring to him by name, as being entitled to more weight because he was a treating source.  Consequently, it is clear that these two doctors are "treating sources" within the meaning of § 404.1527(d)(2) thereby making applicable the Commissioner's promise that the SSA will "always" give good reasons for the weight given treating-source opinions.

### 3.      The opinions of Drs. Kemp and Nielsen were not irrelevant

The Commissioner makes two arguments for why it was unnecessary to address the opinions of Drs. Kemp and Nielsen.   The first is that their opinions were irrelevant because the treatment rendered by them was prior to the "alleged onset of disability date," which was amended to be July 18, 2005.  But, in making this argument, the Commissioner is being more than a little disingenuous.

First, even when considering the  July 18, 2005, "onset date," we are talking about only a matter of months between the dates of the latest evaluations and treatment by Drs. Kemp and Nielsen and the amended "onset date."  For example, Dr. Nielsen's evaluation and treatment, which was done at the behest of the SSA, took place in late December 2004, and his letter, stating that Moran was suffering from chronic pain related to fibromyalgia and restricting her work to no more than two days per week, four hours per day, indefinitely, is dated April 27, 2005.

Second, as the Commissioner acknowledges elsewhere in his brief, Moran claims the onset of the medical problems giving rise to her disability occurred prior to her amended onset date of July 18, 2005.  For example, Moran's applications for disability and SSI benefits were filed on October 19, 2004, and both gave the date of March 25, 2004, as the date when her disabling conditions affected her ability to work.  (Tr. 90, 256).  In fact, her claims for disability and SSI benefits were actually denied by the SSA initially and upon reconsideration prior to July 18, 2005.  It was not until shortly before the date initially set in 2006 for the ALJ's hearing on her administrative appeal that Moran retroactively amended her "onset date" to conform to the date when she ceased working even part time.  In other words, the "amended onset date" had more to with to do with procedure, *i.e.*, eliminating having to argue about disability between her initially claimed "onset date" and the "amended onset date," when she ceased working even part time, than it had to with when her illness started to impact her working ability.

Third, the ALJ in his opinion did not restrict his consideration of the medical evidence to the time period after July 18, 2005.  For example, the ALJ made reference to Dr. Lampman's initial evaluation and examination of Moran on February 4, 2005.  (Tr. 28).  Also, he pointed to certain lab results and physical findings from Dr. Nielsen's report of his examination of Moran on December

21, 2004, to suggest that there was absent evidence of an inflammatory disease, including fibromyalgia.  (Tr. 30, 190 ( Ex. 2F, p. 5))

Fourth, when the medical evidence favors him, the Commissioner has not restricted his argument to the post-July 18, 2005, time frame.  For example, to support the conclusion that Moran only complained of diffuse pain and hypersensitivity, and that there was no evidence of inflammatory or immunologic disease, the Commissioner cites at page 17 of his brief to page 189 of the record, which is the report of a follow-up visit that Moran had with Dr. Lampman on April 11, 2005.  Likewise, at page 23 of his brief, he refers to the conclusions of the State DDS physicians for which the initial assessment was on January 27, 2005, and the one-sentence update on June 16, 2005.  (Tr. 211).

### 4.    The violation of § 404.1527(d)(2) was not harmless error

The second argument that the Commissioner makes to excuse the failure to address the weight given to the opinions of doctors Kemp and Nielsen as treating sources is because their opinions were duplicative of the subsequent opinions of Dr. Lampman and Dr. Kennedy, which the ALJ did address.  The Commissioner argues that, under these circumstances, any error was harmless given what he claims is the otherwise substantial evidence supporting his decision.

A number of Eighth Circuit cases have emphasized the mandatory language of § 404.1527(d)(2) in terms of the ALJ's responsibilities for discussing the weight given to treating-source opinions.  E.g., Hamilton v. Astrue, 518 F.3d at 610 ("Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight.");  Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001) (same).  What does not appear to be completely settled, however, is the consequence of non-compliance, and when, if ever, it can be harmless, given the promise that the weight accorded to treating source will

"always" be discussed.  Compare Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (remanding for failure to give reasons for the weight afforded a treating physician's evaluation and citing the "will always give good reasons" language of § 404.1527(d)(2)); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (same); with Black v. Apfel, 143 F.3d 383, 385-386 (8th Cir. 1998) (holding that ALJ did not err in failing to discuss a letter from a treating source expressing the opinion that the claimant was disabled on the basis that the ALJ was not required to discuss every piece of evidence, the ALJ did reference the doctor's evaluation and relied upon relevant treatment information from the doctor's notes, and that it was unlikely the ALJ had not considered the doctor's opinion regarding disability); cf. Prince v. Bowen, 894 F.2d 283, 285-286 (8th Cir. 1990) (holding prior to the current version of § 404.1527 that "[a]n ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled constitutes error where here, the record contains no contradictory medical opinion.").

For the most part the same is true outside the Eighth Circuit.  A number of courts have cited the mandatory-discussion requirement of § 404.1527(d)(2) for the weight accorded to treating sources and have not hesitated to reverse and remand when there has been a violation.  E.g., Nyberg v. Commissioner of Social Security, 179 Fed.Appx. 589, 592, 2006 WL 1168815, *3 (11th Cir. 2006) (unpublished per curiam opinion); Wilson v. Commissioner of Social Security, 378 F.3d 541 (6th Cir. 2004); Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003); Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000); Snell v. Apfel, 177 F.3d 128, 133-134 (2d Cir. 1999); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).   Less well-developed are the circumstances in which non-compliance may be considered harmless and what the appropriate test for harmless error is in this situation.

For example, the position of the Tenth Circuit is that a failure to discuss the weight accorded to a treating source's opinion prevents meaningful review, which suggests that a failure to discuss would be excused in few, if any, instances when the treating source's opinion is favorable to the claimant on a material, contested issue.  See Watkins v. Barnhart, supra (remanding because the failure on the part of the ALJ to explain the weight he gave to the opinion of the claimant's treating physician prohibited any meaningful review and citing earlier Tenth Circuit cases holding the same); Drapeau v. Massanari, 255 F.3d 1211, 1213-14 (10th Cir. 2001).  The particular concern expressed by the Tenth Circuit is that the failure to address treating source opinions favorable to the claimant puts the court in the position of having to re-weigh the evidence, which is not the court's proper role. Id.

The Second Circuit has expressed similar concerns.  Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir.1998).  And, in a recent unpublished opinion from the Eleventh Circuit, the court rejected a claim of harmless error for a failure to discuss the weight accorded to a treating-source opinion favorable to the claimant because it would require the court to re-weigh the evidence.  The court stated:

> In essence, the Commissioner contends (and the district court believed) that, even if the ALJ had considered Dr. Trowbridge's opinion, the outcome of the case could not reasonably have changed. See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983) (ALJ's mischaracterization of claimant's past work was harmless error, because such characterization of vocational factors was irrelevant where the ALJ found no severe impairment). The instant case, however, is not one where the unmentioned physician's opinion merely supported the ALJ's conclusion, and was thus unnecessary. See Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 547 (6th Cir.2004).  On the contrary, the potential impact of Dr. Trowbridge's opinion on the ALJ's analysis is strongly and reasonably disputed by the parties.  Thus, we cannot say that the failure to address Dr. Trowbridge's opinion was harmless without re-weighing the evidence and engaging in conjecture that invades the province of the ALJ. See Moore, 405 F.3d at 1214 (stating that, where ALJ failed to consider certain factors and indicate their impact on his ultimate conclusion as to claimant's residual functional capacity, we "[could not] even evaluate the Commissioner's contention

that the ALJ's error was harmless"); Wiggins, 679 F.2d at 1390 (remanding where we were "unable to determine whether the ALJ applied the proper legal standard and gave the treating physician's evidence substantial or considerable weight or found good cause not to do so"); Wilson, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.").

Nyberg v. Commissioner of Social Security, 179 Fed.Appx. at 592, 2006 WL 1168815, *3 (footnotes omitted).  Likewise, the district court for the Western District of Texas has recently rejected a claim of harmless error for the same reasons.  Morris v. Barnhart, 2007 WL 496851, *10 (W.D. Tex. 2007).

The most well-developed case law as to when non-compliance with the mandatory-discussion requirement may be excused appears to be in the Sixth Circuit following the lead case of Wilson v. Commissioner of Social Security, 378 F.3d 541 (6th Cir. 2004).  In Wilson, the Sixth Circuit noted that the requirement for the Commissioner giving reasons for the weight accorded treating sources serves two important purposes.  The first is that it gives transparency to the process. The court stated:

"The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir.1999).

Id. at 544.  The second is that it "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.  Id. (citing Halloran v. Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004)).

After exploring the purposes for the regulation, the Sixth Circuit in Wilson then discussed what it perceives to be the differences between administrative rules that are intended to "confer important procedural benefits upon individuals" and those that are adopted merely to provide for the

28

"orderly transaction of business before [the agency]." Id. at 547 (quoting American Farm Lines v. Black Ball Freight Service, 397 U.S. 532, 538-539 (1970)).  The court concluded that regulations of the former type bestow substantial rights on the parties before the agency that require rigorous compliance while the latter allow the agency more discretion in terms of relaxation or modification, such that a failure to follow the rules is not reviewable except upon a showing of substantial prejudice.  The court then stated that "[s]ection 1527(d)(2) falls in the former category, creating an important procedural safeguard for claimants for disability benefits." Id.

Based on this analysis, the Sixth Circuit concluded in Wilson that a failure to follow the mandatory-discussion requirement for treating sources requires a remand in most cases, even when there is substantial evidence supporting the Commissioner's decision.  Wilson left open the possibility, however, of applying the harmless-error rule when there has been only a *de minimis* violation and gave three possible examples: (1) where "the treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) where "the Commissioner adopts the opinion of the treating source or makes findings consistent with opinion," and (3) where "the Commissioner has met the goal of § 404.1527(d)(2) - the provision of the procedural safeguard of reasons - even though she has not complied with the terms of the regulation." Id. at 547.   Since Wilson, there have been a number of Sixth Circuit cases applying the Wilson analysis. E.g., Fisk v. Astrue, 235 Fed.Appx. 580, 586, 2007 WL 3325869, *4 (6th Cir. 2007) (unpublished per curiam) (error not harmless); Bowen v. Commissioner of Social Security, 478 F.3d 742, 746-750 (6th Cir. 2007) (error not harmless); Nelson v. Commissioner of Social Security, 195 Fed.Appx. 462, 469-472, 2006 WL 2472910, *7-10 (6th Cir.2006) (unpublished per curiam) (error harmless); Hall v. Commissioner of Social Security, 148 Fed.Appx. 456, 464-467, 2005 WL 2139890, *7-10 (6th

2005) (error not harmless); Heston v. Commissioner of Social Security, 245 F.3d 528 (6th Cir. 2001) (error harmless).

After considering the case law from the Eighth Circuit and the other circuits, it appears that the mandatory-discussion requirement of § 404.1527(d)(2), including the "will always" language, should not foreclose application of a harmless-error analysis. However, the harmless-error rule should not be applied in the manner that appears to be suggested by the Commissioner in this case.

In his brief, the Commissioner argues that the failure to address the opinions of Drs. Kemp and Nielsen is harmless because their opinions were cumulative of the opinions of Drs. Lampman and Kennedy. Assuming for the moment this to be true, it appears the Commissioner is suggesting one or more of the following possibilities as to why this can be harmless error: (1) the court can look to the other evidence and conclude there was substantial evidence supporting the ALJ's decision; (2) it is possible for the court to surmise how the ALJ would have weighed the Drs. Kemp and Nielsen's opinions, conclude that the ALJ would have discounted the opinions, and conclude that there was substantial evidence supporting his decision as a consequence; or (3) that it is possible for the court to conclude that the ALJ, in fact, weighed the evidence and appropriately discounted it even though he did not explicitly discuss the weight he accorded to it.

None of these possibilities, however, would be an appropriate application of the harmless-error rule in light of the weight of the authority cited above. The Sixth Circuit's analysis in Wilson as to why the mandatory-discussion requirement of § 404.1527(d)(2) forecloses these arguments for harmless error, at least in most cases, is persuasive. But, aside from that, all three of these arguments for harmless error require the court to re-weigh evidence and make credibility determinations to one degree or another, which is not the court's proper role. See, e.g., Nyberg v.

Commissioner of Social Security, 179 Fed.Appx. at 592, 2006 WL 1168815, *3; Morris v. Barnhart, 2007 WL 494851 at *10.[4]

While other types of errors may warrant a different harmless-error analysis, the correct application of the harmless-error rule in this case to avoid re-weighing the evidence and invading the province of the agency would seem to require a determination of one of two things:  The first is that the treating-source opinion was so deficient that no reasonable ALJ would have given it any weight. Wilson v. Commissioner of Social Security, 378 F.3d at 547; see Nyberg v. Commissioner of Social Security, 179 Fed.Appx. at 592 n.5; 2006 WL 1168815, *3 n.5.  The second is that, after giving the treating-source opinion its full weight, no reasonable ALJ could have reached a different disability determination.  Cf., Dewey v. Astrue, 509 F.3d 447, 449-450 (8th Cir. 2007); Stout v. Commissioner, Social Security Administration, 454 F.3d 1050, 1054-55 (9th Cir. 2006).[5]

To the extent that the Eighth Circuit's decision in Black v. Apfel, supra, might be construed as authorizing a broader application of the harmless-error rule, the case appears to be distinguishable

_____

[4]  In part, this is a function of the limited standard review.  "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support a conclusion and is something less than the weight of the evidence.  E.g., Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  By definition, the "substantial evidence" standard allows for the possibility of drawing two inconsistent conclusions.  Id.  Consequently, simply concluding there may be substantial evidence upon which the Commissioner could have denied benefits does not account for the "zone of choice" that the Commissioner has in terms of an award of benefits.  In other words, the mere fact that there may be substantial evidence supporting a denial of benefits does not account for the possibility that, if the evidence not explicitly discussed had been properly weighed, an award of benefits may have been made because it may have also been possible to conclude there was  substantial evidence supporting an award of benefits.  See id.

[5]  As noted above, the Sixth Circuit in Wilson suggested a third possibility, i.e., the  Commissioner clearly met the goal of § 404.1527(d)(2) even though he did not comply with its terms.  Following Wilson, the Sixth Circuit applied the exception and found harmless error in Nelson v. Commissioner of Social Security, but stated in the opinion it was a "rare case." 195 Fed.Appx. at 469-472, 2006 WL 2472910, *7-10.  Since Nelson, the Sixth Circuit has refused to apply this exception in at least two other cases and has emphasized that, indeed, it would be a rare situation in which the exception would apply.  Fisk v. Astrue, 253 Fed.Appx. at 585-586, 2007 WL 3325869, *6; Bowen v. Commissioner of Social Security, 478 F.3d at 746-750.  There are at least two problems with this exception as recognized by these cases, at least implicitly.  First, its vagueness threatens to swallow the rule and allow the SSA to violate with impunity its promise that the weight of treating-source opinions will always be discussed.  Second, if one of other exceptions does not apply, then applying this exception inevitably gets the court back to having to re-weigh the evidence.  See id.  In any event, a review of these cases makes clear that the Sixth Circuit would not apply this third exception to the facts of this case.

on the grounds that the opinion alleged to have been ignored in that case went to the ultimate issue of disability, which is reserved to the Commissioner, and the fact that apparently the ALJ did reference the doctor's evaluation and relied upon some of his findings.  Further, and perhaps more importantly, the court in <u>Black</u> did not reference the mandatory requirements of § 404.1527(d)(2), much less discuss what constitutes harmless error in light of the regulation.  <u>Black v. Apfel</u>, 143 F.3d at 385-386.

In this case, if an ALJ was to find the opinions of Drs. Kemp and Nielsen credible, and particularly their opinions relating to the limitations on Moran's ability to work, it cannot confidently be predicted that the outcome would be the same.  In fact, in that instance, there would be substantial evidence to support an award of benefits given the testimony of the vocational expert that the work limitations they imposed would disqualify Moran from competitive employment.  Further, while there may be grounds for discounting to one degree or another the opinions of Drs. Kemp and Nielsen, neither of their opinions are so clearly deficient that they could not possibly be relied upon and given weight.  Consequently, the failure of the ALJ to discuss the weight of the opinions of Drs. Kemp and Nielsen is not harmless error.

But, even if one of the less rigorous arguments for harmless error implicitly suggested by the Commissioner could be made, the circumstances of this case do not support a conclusion of harmless error, particularly given the closeness of the case.  There are several reasons why.

First, the ALJ discounted  Dr. Kennedy's evaluation, in part, because he believed it to have been solely for disability determination purposes and not for treatment. (Tr. 30-31).  In arguing that this was correct and at the same time arguing that the opinions of Drs. Kemp and Nielsen were cumulative to those of Drs. Lampman and Kennedy, the Commissioner is trying to have it both ways.  In other words, it is inconsistent to argue that Dr. Kennedy's evidence can be discounted, in part,

because it was not for treatment, and then argue that the findings and conclusions of Drs. Kemp and Nielsen as treating sources were cumulative.

Second, the argument that Dr. Nielsen's report was merely cumulative fails to place his report and his subsequent letter in their proper context.  While it may be possible to conclude that Dr. Nielsen's December 21, 2004, assessment was tentative and that he believed consultation with Dr. Lampman would be helpful, Dr. Nielsen's letter of April 27, 2005, was written after Dr. Lampman had examined Moran and sent his report to the clinic where Drs. Kemp and Nielsen were providing treatment to Moran.  In other words, when Dr. Nielsen concluded in his letter that Moran was suffering chronic pain as related to fibromyalgia and imposed significant work restrictions, the record supports the conclusion that he did so based not only on his examination, but also the report received from Dr. Lampman.  This alone is reason why his evaluation and subsequent letter cannot be considered merely cumulative.   See Risk v. Astrue, 253 Fed.Appx. at 585, 2007 WL 3325869, *5.

Third, the ALJ relied upon portions of Dr. Nielsen's report without mentioning Dr. Nielsen or discussing his conclusions.  As noted earlier, the ALJ stated that the lab results referenced in his report were evidence that there was no inflammatory disease, such as fibromyalgia. (Tr. 30, 191-192 (Ex. 2F, pp.5-6)).  Also, the ALJ relied upon certain physical findings from Dr. Nielsen's report to discount Dr. Kennedy's physical findings and stated he was giving the "earlier examination mentioned in Exhibit 2F [i.e., Dr. Nielsen's examination] more weight because it was a treating source for the purposes of treatment."  (Tr. 31, 191-192).  In other words, the significant weight placed on the lab results and physical findings from Dr. Nielsen's report belies the Commissioner's claim that his report was merely cumulative and that it was unnecessary to discuss his ultimate conclusions. See Hall v. Commissioner of Social Security, 148 Fed.Appx. at 465, 2005 WL 2139890, *8.

Fourth, there is nothing in § 404.1527 that provides that an ALJ may ignore the opinion of a treating source on the grounds that it is cumulative.  In fact, consistency of the medical opinion evidence is an important factor under § 404.1527(b)-(d) in terms of its evaluating the weight of the evidence.

Finally, in assessing the question of harmless error,  the only medical evidence that the ALJ explicitly relied upon to reach a conclusion with regard to Moran's ability to work at a level that would allow for competitive employment, contrary to that of Drs. Kemp, Nielsen, Lampman, and Kennedy, is the RFA conducted by the Mercy Wellness Center, which as discussed later also has its own questions.

### C.      The failure to discuss the opinions of Dr. Nielsen

Aside from the fact that Dr. Nielsen likely fell within the category of being a "treating source," Dr. Nielsen's December 21, 2004, examination and evaluation were at the behest of the SSA. This is reason alone to have merited discussion not only with respect to Dr. Nielsen's December 21, 2004, evaluation and his prescription the next day imposing work restrictions, but also his April 27, 2005,  letter continuing strict work restrictions upon Moran for an indefinite period.  There is something fundamentally wrong with the SSA directing a claimant to undergo an evaluation and then not giving reasons why the opinion of the evaluating doctor should not be accorded due weight when the results turn out to be unfavorable for the SSA.

### D.      The perfunctory assessment of Moran's subjective complaints

The ALJ concluded that the "the claimant's statements concerning the intensity, persistence and limiting effects of symptoms are not entirely credible."  Following this statement, there is an extended discussion of the medical record.  And, while it may be possible to surmise from this discussion some of the reasons why the ALJ discounted Moran's credibility in terms of her subjective

complaints, there is no specific listing of the reasons why Moran's credibility and her subjective complaints were discounted, nor is there any specific discussion of what earlier has been referred to as the "Polaski" factors in terms of relating those factors to the evidence.

While an ALJ is not required to specifically discuss each Polaski factor, see, e.g., Goff v. Barnhart, 421 F.3d 785, 791-792 (8th Cir. 2005), the conclusory discounting of Moran's subjective complaints without a more specific discussion is a particular problem in this case because of the anonymous letter, which is devastating to Moran's credibility if it is to be believed. The ALJ stated in his decision that he gave the letter "little weight" because of the potential for bias, but he did not say he gave it no weight. Hence, there remains the possibility he may have considered the letter, at least in part, in weighing Moran's credibility and her subjective complaints.

Further, this is not idle speculation. The Commissioner has apparently reached the same conclusion and believes the letter was fair game in terms of giving credit to its contents. This is because the Commissioner relies upon the letter in his brief in addressing Moran's credibility and her subjective complaints. Commissioner's Brief, Doc. No. 13, p. 19. And, this can only have been for the purpose of articulating the evidence that was likely relied upon by the ALJ in assessing Moran's credibility and her subjective complaints since the Commissioner also notes in his brief, and correctly so, "it was the ALJ's duty, rather than the Court's, to weigh the evidence and resolve conflicts." Commissioner's Brief, Doc. No. 13, p. 20, citing Bentley v. Shalala, 53 F.3d 784, 785 (8th Cir. 1995).

While hearsay evidence is admissible and the rules of evidence do not apply in SSA proceedings, fundamental fairness dictates that anonymous evidence like this not be considered. See McClees v. Sullivan, 879 F.2d 451, 453 (8th Cir. 1989); cf. Richardson v. Perales, 402 U.S. 389, 407-408 (1971) (no due process or lack of substantial evidence concern regarding the use of physician reports in an SSA proceeding given that the authors were known, there was an opportunity for the

claimant to have subpoenaed the persons, and the existence of other indicia of reliability); Hepp v. Astrue, 511 F.3d 798, 804 (8th Cir. 2008) (same).[6]  As noted earlier, the record indicates the evidence was objected to, at least initially, and that transcription problems prevent the determination of whether Moran's attorney later acquiesced to its admission as part of the record.[7]

Perhaps, if the ALJ had spelled out more clearly the reasons why he had discounted Moran's credibility and made no reference to the letter, there might not be the same cause for concern in light of the statement that he gave it little weight.  But this is not the case and there is no assurance that Moran has not been unfairly prejudiced.[8]

There is another problem with the ALJ 's perfunctory treatment of the reasons for discounting Moran's credibility and her subjective complaints, which by itself may not be reason for remand. This is the importance of these complaints in terms of the diagnosis of what may be causing her claims of pain and fatigue (i.e., whether it is fibromyalgia or some similar illness), given that there may be no confirming objective tests, see, e.g., Pirtle v. Astrue, 479 F.3d 931, 935 (8th Cir. 2007); Broshnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003), and, even more importantly, to the

---

[6]  The fact that Moran testified she suspected the letter came from her ex-husband and had the opportunity to give reasons why she believed it should be discounted does not alleviate the concerns over the use of the letter.  First, there is the question of fairness.  Moran should not have been put in the position of having to speculate who wrote the letter - particularly, as the record reflects here, having to do so just prior to the commencement of the hearing.  Second, and even more fundamental, is the concern of the reliability of the evidence given that its author was unwilling to take responsibility for its contents by putting his or her name to it.

[7]  The ALJ has the duty to develop the record fully and fairly, even when the claimant is represented by counsel, given the non-adversarial nature of the process and the ALJ's role as an examiner charged with developing the facts. E.g., Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).  The better practice may have been for the ALJ not to have proposed the letter as an item for inclusion in the record in the first instance.  See Preston v. Shalala, 1994 WL 315756, *1 (S.D. Iowa 1994) (recommending as a future practice that anonymous reports be disregarded completely).  If this matter is remanded, the undersigned believes the anonymous letter should be stricken from the record.

[8]  This is not to say that the subjects addressed in the anonymous letter were not relevant.  Upon receipt of the letter, it would be perfectly proper for the SSA to have investigated the claims being made and to have gathered reliable evidence for use in evaluating Moran's claim  Also, in proper cases (but not to suggest that this was one of them), the SSA could make a criminal referral for fraud if it concluded that this is what was occurring.

determination of her ultimate RFC, particularly in terms of her ability to work day-in-and-day-out

in a competitive economy without excessive absences, see Reed v. Barnhart, 399 F.3d 917, 922-924

(8th Cir. 2005); Singh v. Apfel, 222 F.3d at 452.  If this matter is remanded, a more explicit

explanation of the reasoning employed to discount Moran's subjective complaints would make it

easier to evaluate whether the ALJ fairly considered them.  See Broshnahan v. Barnhart, 336 F.3d

at 677-678 (rejecting a number of the ALJ's reasons for discrediting the claimant's subjective

complaints in that case without better reason because the complaints were consistent with symptoms

of fibromyalgia).

.       **E.      The failure to address the totality of the Mercy Wellness Center's FCA**

        While the formal results of the Mercy Wellness Center's  RFA may support the conclusion

that Moran is capable of light work with substantial restrictions (which, presumably, includes the

sedentary work that the ALJ found she was capable of performing), there is the qualifying note by

the Mercy Wellness examiner, which the ALJ does not discuss, that the "[l]imitations seen during

the FCE would suggest difficulty at any occupational level."  What does this mean?  Can it suggest,

for example, that Moran may have difficulty consistently performing at the level found by the FCA

such that she may need to be excused from work three or more days per month as Drs. Lampman and

Kennedy concluded and which, if true, would disqualify her from competitive employment according

to the vocational expert?  If this matter is remanded, this should be clarified.[9]

---

[9] Anticipating the concern about the ALJ's failure to address this comment, the Commissioner argues in his brief that the results of the assessment were consistent with paper RFA made by the state agency DDS physicians.  There are several problems with this observation.

        First, the ALJ made no mention of the DDS physicians' RFA in his decision. This is yet another instance in which the Commissioner has cited to evidence not explicitly relied upon by the ALJ to make his substantial evidence argument.

        Second, the DDS physicians' paper assessment was well before the Mercy Wellness Center assessment that was based on actual testing, albeit with questions regarding whether Moran gave her full effort.  In the Eighth Circuit, "paper assessments" of residual functional capacity without an actual examination are admissible, but are accorded limited weight, particularly in the face of other more credible evidence.  E.g., Nevland v. Apfel, 204 F.3d 853, 857-858

**F.      Moran is not entitled to a remand for an award of benefits**

Ordinarily, remand for further determination by the agency is the remedy when there are deficiencies in the Commissioner's determination.  It is only when the total record convincingly establishes disability and is transparently one-sided against the Commissioner's decision that a remand for an award and computation of benefits is warranted.  See, e.g. E.g., Hutsell v. Massanari, 259 F.3d 707, 714 (8th Cir. 2001);  Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991); Jefferey v. Secretary of H.H.S., 849 F.2d 1129, 1133 (8th Cir.1988).   Such is not the case here.

Without going into detail, there may be reasons that the ALJ could rely upon for concluding: that Dr. Lampman's reports and evaluations should be given the greatest weight over the reports of the other medical experts, including Drs. Nielsen, Kemp, and Kennedy;  that Dr. Lampman did not foreclose the possibility of Moran being able to work at some level of employment if testing showed she was capable; that the ALJ's discounting of Dr. Lampman's responses to the questionnaire sent to him by Moran's attorneys was appropriate, particularly those that related to Moran's RFC given the actual testing; and the suggestion by the Mercy Wellness testing that Moran may be capable of performing sedentary work.  Likewise, there appears reasons for discounting, at least to some extent, Moran's subjective complaints.

---

(8th Cir. 200); Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997).
    Third, it cannot be determined from the record what medical records the DDS physicians actually reviewed in making their assessment.  There is no listing or index in their assessment of the medical records they reviewed, and just because a particular medical record predates the assessment does not mean it had actually been collected and received by the SSA, much less filed in a record for examination by the DDS physicians.  For example, when the initial paper assessment was made in January 27, 2005, the initial DDS physician did not have the benefit of Dr. Nielsen's April 27, 2005, letter continuing significant work restrictions after Dr. Lampman's examination.  Further, in terms of the review made by the second DDS physician, there is no way to tell from his one-sentence update on June 16, 2005, whether Dr. Nielsen's April 27, 2005, letter had been included in the records he reviewed or not.

**IV.      CONCLUSION AND RECOMMENDATION**

Based on the foregoing, it is hereby **RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Docket No. 12) be **DENIED**, that Moran's Motion for Summary Judgment (Docket No. 8) be **GRANTED** in part, that the decisions of the Commissioner be **REVERSED,** and this matter **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation.

Dated this 10th day of June, 2008.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge